# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **GARY L. WALDRON** <br> 119 Klicher Rd. <br> Gallipolis, OH 45631 <br><br> Plaintiff, <br><br> v. <br><br> **WAL-MART, INC.** <br> 702 S.W. 8th Street <br> Bentonville, AR 72716 <br><br> **ALSO SERVE** <br> **WAL-MART STORES EAST, LP** <br> c/o Statutory Agent <br> CT Corporation System <br> 4400 Easton Common Way <br> Suite 125 <br> Columbus, OH 43219 <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO: <br><br> JUDGE: <br><br><br><br> **COMPLAINT** <br><br><br> **Jury Demand Endorsed Herein** |

For his Complaint against Defendant Wal-mart, Inc. ("Walmart"), Plaintiff, Gary L. Waldron ("Mr. Waldron"), alleges as follows:

## JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction pursuant to the following statutes:

    a. 28 U.S.C. §1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States.

    b. 28 U.S.C. 1343 (3) and (4), which gives district courts jurisdiction over actions to secure civil rights extended by the United States government; and

    c. 28 U.S.C. §1367 which gives the district court supplemental jurisdiction over state law claims.

1

2. Walmart has and had at all times relevant to the claims asserted operated the Walmart Supercenter located at 2145 Eastern Ave., Gallipolis, Ohio.

3. Venue is properly laid in this judicial district under 28 U.S.C. §§ 1391(b) and 1391(c) because (1) the defendant is subject to personal jurisdiction in this judicial district and, thus, qualifies as a resident under 28 U.S.C. §1391(c) (2); and (2) all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## THE PARTIES

4. Mr. Waldron is a Caucasian individual who resides and is domiciled in the County of Gallia, City of Gallipolis, State of Ohio, and is a former employee of Walmart.

5. Walmart is a Delaware corporation with a principal place of business located in the city of Bentonville, County of Benton, State or Arkansas. Walmart was also an "employer" within the meaning of Title VII, Ohio Rev. Code §4112.01, *et. seq.*, the Ohio Civil Rights Act, at all times relevant to Mr. Waldron's claims.

## BACKGROUND AND FACTUAL ALLEGATIONS

6. Mr. Waldron restates the allegations in paragraph 1 through 5 as if fully rewritten herein.

7. Mr. Waldron began employment with Walmart on or about November 16, 2019.

8. Within three days of being hired at Walmart, management moved Mr. Waldron from a position in the garage to Asset Protection Associate because of his extensive background in law enforcement.

9. Mr. Waldron was the highest performing Asset Protection Associate at the Walmart Supercenter.

10. Mr. Waldron had no previous disciplinary record at the Walmart Supercenter.

11. Mr. Waldron was trained at three different Walmart stores in loss prevention, procedures, processes, and techniques.

12. After Mr. Waldron's training, he was employed at the Walmart Supercenter located at 2145 Eastern Ave., Gallipolis, Ohio.

13. Walmart educated and trained Mr. Waldron that the self-checkout register area is where the majority of theft occurs in Walmart stores.

14. On July 2, 2020, near the end of the business day for the Walmart Supercenter, Mr. Waldron was observing the self-checkout register area and its customers, as was prescribed by Mr. Waldron's training.

15. On July 2, 2020, Mr. Waldron witnessed an African-American woman take seven bottles of wine out of her shopping cart and place them into a bag without scanning each individual bottle at the self-checkout register.

16. Mr. Waldron checked the electronic receipt from his surveillance equipment and did not see the seven bottles scanned on the electronic receipt.

17. Mr. Waldron then contacted his customer service manager, Bridget Wright ("Ms. Wright"), and told Ms. Wright that when the woman leaves, he would be conducting a receipt check and that she should accompany him.

18. This procedure of a receipt check is a common one and was done according to Walmart security procedures.

19. Mr. Waldron and Ms. Wright approached the woman, and Mr. Waldron identified himself as an Asset Protection Associate.

20. Receipt checks for suspicion of theft were done regularly at all the Walmarts that Mr. Waldron had ever trained at or worked in during his tenure.

21. Mr. Waldron then attempted to check the woman's receipt, in the manner in which he was trained. The procedure was to merely check the receipt of any customer when theft was suspected and ascertain that all items had been paid for by the customer.

22. Mr. Waldron never detained the woman, nor did he ever accuse her of theft as witnessed by Ms. Wright.

23. After Mr. Waldron and Ms. Wright approached the woman, and the receipt check was in progress, the woman reacted belligerently by yelling, throwing her hands around, and shouting that Mr. Waldron was only checking her receipt because she was black.

24. Mr. Waldron only approached the woman after witnessing the items go directly from a shopping cart and into a bag, bypassing the self-checkout scanner.

25. Walmart's internal document(s) state that the woman was "irate" when Mr. Waldron initiated the receipt check.

26. Mr. Waldron was worried about the woman becoming violent and the woman said her husband was going to come to the store. Mr. Waldron was also concerned that the manner in which the husband's name was invoked indicated that he may become violent as well when he entered the store.

27. Mr. Waldron reiterated to the woman that he was not accusing the woman of theft or detaining her.

28. By this time, the Walmart Supercenter was closed for business, and Mr. Waldron was concerned about the safety of the exiting customers and Walmart employees.

29. Only then did Mr. Waldron call law enforcement, as confirmed by the audio recording of the Gallipolis Police Department, because he was concerned about the safety of the customers and Walmart employees.

30. Mr. Waldron was then informed by the self-checkout cashier that the items had been paid for but were scanned in an incorrect manner.

31. The moment it was confirmed that there was no theft, Mr. Waldron informed the woman that the receipt had been checked and nothing else was needed from her.

32. Mr. Waldron informed the woman multiple times that there was no problem and Walmart was not detaining her, accusing her of anything, or stopping her from leaving the store.

33. A store manager was informed of the situation with the woman and also tried to deescalate the situation.

34. Mr. Waldron then called law enforcement again, which was recorded by the Gallipolis Police Department, before they entered the store, and told them the situation was handled and that they were not needed, as the situation was resolved.

35. Law enforcement only entered the building after the call had been cancelled because they could hear the woman yelling from outside the store.

36. After law enforcement entered on their own accord, the store manager and law enforcement escorted the woman from the store.

37. During Mr. Waldron's training and employment, he was told by Karen Watson, his direct supervisor, that if a "door greeter" was not present, an Asset Protection

Associate was to take over the role of "door greeter." That role included conducting receipt checks.

38. Mr. Waldron was also told by Karen Watson that a receipt check should be conducted if an Asset Protection Associate suspects someone of theft.

39. Mr. Waldron saw items being placed into bags without being scanned and no other registers were open in any other areas of the Walmart Supercenter.

40. Mr. Waldron knew that the items being placed into bags, without being scanned, had not been paid for at any other register because no other registers were open in any other areas of the Walmart Supercenter.

41. Mr. Waldron has seen other Asset Protection Associates conduct themselves in this exact manner "too many times to count" and they were not terminated.

42. Mr. Waldron acted at all times in accordance with Walmart's procedures, as he was trained to do.

43. Mr. Waldron and Bridget Wright have both been present for other receipt checks that were conducted by Mr. Waldron and Jessie Murray, another Asset Protection Associate at the Walmart Supercenter, on Caucasian customers. During these receipt checks the customers had also paid for the goods but the Asset Protection Associates believed the customer had not paid for the goods. In these cases, not only were the Asset Protection Associates not terminated, there were zero repercussions to the associates.

44. On or about July 3, 2020, the woman, Monica Valentine, made a Facebook post directed at Walmart, stating that she was racially profiled and scheduled a protest at

6

the store. The Facebook Post has been filed herewith and is incorporated herein Exhibit A.

45. Upon information and belief, Walmart felt pressured by this post and wrongfully made an example out of Mr. Waldron by terminating him based on his race.

46. On or about July 5, 2020, Mr. Waldron had a meeting with Angela Conrad ("Conrad"), the direct supervisor of Karen Watson.

47. Conrad said, in this meeting, that the situation would probably be different if the woman was not black.

48. Mr. Waldron, Mr. Waldron's store manager, Rickey Gainey, and Karen Watson were present when Conrad said this comment about race.

49. Mr. Waldron was then terminated on or about July 7, 2020, by Rickey Gainey and Karen Watson.

50. Rickey Gainey said in this meeting that he never thought Mr. Waldron would be terminated for this and that he was shocked Mr. Waldron was not merely coached on the incident.

51. Mr. Waldron then scheduled a phone conference with a Walmart investigator for July 8, 2020.

52. Mr. Waldron requested the policy he allegedly violated and the statement that he wrote surrounding the incident during this phone conference.

53. The Walmart investigator told Mr. Waldron that Conrad should give him the policy that he allegedly violated and the statement that he wrote surrounding the incident to Mr. Waldron.

54. On or about July 8, 2020, Karen Watson told Mr. Waldron that she was told by Conrad that the Walmart investigator should give him the policy and his statement.

55. Mr. Waldron then placed a call with the Walmart investigator requesting the policy and statement for the third time.

56. Neither Conrad nor the Walmart investigator ever supplied Mr. Waldron with the policy or his statement.

57. As a direct and proximate cause of the discrimination based on race and wrongful termination based on race, Mr. Waldron was unemployed for multiple months, and underemployed for additional months.

## NOTICE OF RIGHT TO SUE

58. On July 30, 2020, Mr. Waldron filed a charge with the Cincinnati Area Office of the Equal Employment Opportunity Commission Charge No. 473-2020-01393 (the "EEOC Charge"), against Defendant alleging race discrimination in connection with Mr. Waldron's termination. The EEOC Charge was cross-filed with the Ohio Civil Rights Commission. All allegations contained in the EEOC Charge are hereby incorporated herein by reference.

59. Mr. Waldron made the following allegations in the EEOC Charge:

> I am a Caucasian. On or about July 7, 2020, I was terminated from my employment as an Asset Protection Associate due to a workplace issue involving an African-American customer.
>
> Management is responsible for the above action.
>
> I believe I have been discriminated against because of my race, Caucasian, in violation of Title VII of the Civil Rights Act of 1964, as amended.

A true and correct copy of the EEOC Charge has been filed herewith as Exhibit B.

60. Mr. Waldron was provided no evidence from the EEOC file and on September 11, 2020, the EEOC closed its charge file and issued to Mr. Waldron a right to sue letter. A true and correct copy of the March 4, 2020, Dismissal and Notice of Rights from the EEOC is filed herewith and incorporated herein by reference as Exhibit C.

## COUNT I

*Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 USCS §2000e et. seq.*

61. Plaintiff restates the allegations in paragraphs 1 through 60 as if fully rewritten herein.

62. As a direct and proximate result of Walmart's discrimination against Mr. Waldron on the basis of race, Mr. Waldron was wrongfully discharged by Walmart.

63. Mr. Waldron's wrongful discharge by Walmart violates Title VII of the U.S. Code / 42 U.S.C. 2000e-2 in that it is an "unlawful employment practice for any employer- to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin[.]"

64. As a direct and proximate result of Walmart's discrimination, Mr. Waldron has suffered, and continues to suffer, emotional pain and suffering and loss of enjoyment of life.

65. As a direct and proximate result of Walmart's discrimination, Mr. Waldron is due back pay, with interest thereon; front pay or restoration to his prior position; compensatory damages; and expenses and costs incurred from this matter, including attorney's fees.

66. As Walmart's discriminatory acts upon Mr. Waldron were performed with actual malice, Mr. Waldron is additionally entitled to punitive damages from Walmart.

## COUNT II
### Violation of Ohio Civil Rights Act; R.C. §4112.01, *et. seq.*

67. Plaintiff hereby incorporates by reference each and every allegation contained in paragraphs 1 through 66 of this Complaint as if fully rewritten herein.

68. At all times relevant to the claims asserted herein, Mr. Waldron was qualified as an "employee" as defined in R.C. §4112.01(A)(3), and Walmart was qualified as an "employer" as defined in R.C. §4112.01(A)(2).

69. R.C. §4112.02(A) provides that it shall be an "unlawful discriminatory practice" for any employer, on the basis of certain protected characteristics, including, race, "to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

70. Mr. Waldron was treated differently, discriminated against, and terminated as a result of Walmart's discriminatory actions on the basis of his race.

71. Mr. Waldron has suffered both economic loss and personal injury as a result of Walmart's violation of the Ohio Civil Rights Act and will continue to suffer such loss and harm for the foreseeable future.

72. The discrimination against, and termination of, Mr. Waldron by Walmart were unlawful discriminatory practices in accordance with R.C. §4112.02(A).

73. As a direct and proximate result of the discriminatory conduct of Walmart, Mr. Waldron has suffered severe mental pain and anguish, and has incurred damages in an amount not yet fully ascertained.

74. As a further direct and proximate result of the discriminatory conduct of Walmart, Mr. Waldron has sustained a loss of earnings, embarrassment, humiliation, loss of standing in the community, and his ability to enjoy life has been adversely affected.

75. Defendant's discriminatory conduct was intentional, in bad faith, or was in wanton, reckless indifference to Mr. Waldron's rights to not suffer adverse employment action on the basis of his race, thereby entitled Mr. Waldron to punitive damages, as well as compensatory damages, attorneys' fees and other relief.

## COUNT III
### Wrongful Termination in Violation of Ohio Public Policy

76. Mr. Waldron hereby incorporates by reference each and every allegation contained in paragraphs 1 through 75 of this Complaint as if fully rewritten herein.

77. Walmart's termination of Mr. Waldron on the basis of race violates Ohio public policy embodied in the Ohio Revised Code 4112, *et seq.*, designed to protect Ohio citizens from discrimination in employment on the basis of race.

78. Dismissing employees under circumstances like those in Mr. Waldron's termination by Walmart would jeopardize the public policy.

79. Mr. Waldron's termination was motivated by conduct related to the public policy, as stated herein.

80. The employer, Walmart, lacked overriding legitimate business justification for the termination of Mr. Waldron.

81. As a direct and proximate result of Walmart's malicious discriminatory and retaliatory acts and reckless disregard of Mr. Waldron's rights against Ohio public policy, Walmart is liable to Mr. Waldron for compensatory and punitive damages, attorney's fees and costs in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Gary L. Waldron, respectfully requests the following relief:

A. As to Count I, for judgement against Walmart in favor of Mr. Waldron for compensatory damages in an amount to be proven at trial before a jury, which is sufficient to fully compensate Mr. Waldron for his physical and emotional distress, humiliation and embarrassment, loss of income and loss of employment benefits and other damages suffered as a result of Walmart's termination of Mr. Waldron's employment in violation of Title VII of the Civil Rights Act, as alleged in this Complaint;

B. As to Count II, for judgment against Walmart in favor of Mr. Waldron for compensatory damages in an amount to be proven at trial, which is sufficient to fully compensate Mr. Waldron for his physical and emotion distress, humiliation and embarrassment, loss of income and loss of employment benefits and other damages suffered as a result of Walmart's purposeful and malicious violations of the Ohio Civil Rights Act on the basis of race;

C. As to Count III, for judgment against Walmart in favor of Mr. Waldron for compensatory damages in an amount to be proven at trial before a jury, which is sufficient to fully compensate Mr. Waldron for his physical and emotional distress, humiliation and embarrassment, loss of income and loss of employment benefits and other damages suffered as a result of Walmart's wrongful termination in violation of Ohio public policy;

D. As to all counts, Mr. Waldron's reasonable attorney's fees and court costs;

E. As to all counts, punitive damages to the extent permitted by applicable federal and/or state law in an amount to be determined at trial; and

F. As to all counts, such other legal and/or equitable relief to which Mr. Waldron may be entitled, including pre and post judgment interest.

          Respectfully submitted,

          GRUBB & ASSOCIATES, LPA

          */s/ Natalie F. Grubb*_____
          Mark E. Owens (0068335)
          Natalie F. Grubb (0062596)
          437 W. Lafayette Road, Suite 260-A
          Medina, Ohio 44256
          Ph: (330) 725-7252
          Fax: (330) 723-1095
          E-Mail: officemgr@grubbandassoc.com
          *Counsel for Plaintiff*

## **JURY DEMAND**

Mr. Waldron demands a trial by jury on all issues so triable.

          */s/ Natalie F. Grubb*_____
          Natalie F. Grubb (0062596)
          *Counsel for Plaintiff*